1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   VICTOR VIEIRA,

11          Plaintiff,                    No. 2:11-cv-02342 KJN

12          v.

13   CAROLYN W. COLVIN,
     Commissioner of Social Security,

14
            Defendant.                    <u>ORDER</u>
15   _____/

16          Plaintiff, who is represented by counsel, seeks judicial review of a final decision

17   of the Commissioner of Social Security ("Commissioner" or "defendant") denying plaintiff's

18   application for Supplemental Security Income benefits under Title XVI of the Social Security Act

19   ("Act").[1]  In his motion for summary judgment, plaintiff contends that the administrative law

20   judge ("ALJ") in this case erred by: (1) finding that plaintiff did not meet the requirements of

21   Listing 12.05C; (2) failing to consider plaintiff's back impairment; (3) improperly substituting

22   her own "lay opinion" for that of examining physician Dr. Hamilton; (4) improperly relying on

23   the opinions of non-examining physicians in rendering her Residual Functional Capacity

24   _____

25       [1] This case was referred to the undersigned pursuant to Eastern District of California Local
     Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties voluntarily consented (Dkt. Nos. 6, 8) to
     proceed before a United States Magistrate Judge.  28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73; E.D.
26   Cal. L. R. 301.

("RFC") assessment; and (5) providing incomplete hypothetical questions to the Vocational Examiner ("VE").  (See generally, Mot. for Summ. J., Dkt. No. 11.)

Defendant filed a cross-motion for summary judgment and opposition to plaintiff's motion.  (Opp'n, Dkt. No. 12.)  Plaintiff filed reply briefing in support of his motion.  (Reply, Dkt. No. 13.)  For the reasons stated below, the court grants plaintiff's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands this case for an award of benefits.

I.    BACKGROUND

A.    Procedural History[2]

Plaintiff was born on June 23, 1962, and filed an application for disability insurance benefits and supplemental security income on August 29, 2008, alleging a disability onset date of August 30, 2007.[3]  (Administrative Transcript ("AT") 9, 21.)  The Social Security

---

[2]  Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the undersigned does not exhaustively relate those facts here.  The facts related to plaintiff's impairments and medical history will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

[3]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq.  Generally speaking, Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Under both benefit schemes, the term "disability" is defined, in part, as an "inability to engage in any substantial gainful activity" due to "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits.  See 20 C.F.R. §§ 404.1520, 404.1571-1576, 416.920, 416.971-976; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Ninth Circuit Court of Appeals has summarized the sequential evaluation as follows:

Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:  Does the claimant's impairment or combination

1   Administration denied plaintiff's application on December 10, 2008, and upon reconsideration

2   on May 22, 2009.  (AT 74-79.)  Plaintiff filed a request for a hearing on July 21, 2009 (AT 93),

3   and the ALJ conducted a hearing on May 4, 2010.  Plaintiff, who was represented by an attorney,

4   testified at the hearing.  (AT 33-63.)

5          In a decision dated July 19, 2010, the ALJ denied plaintiff's application for

6   benefits based on a finding that, while plaintiff is not capable of performing his past relevant

7   work as a truck driver and warehouse worker, plaintiff is capable of performing work that exists

8   in significant numbers in the national economy, including work as a janitor, dining room

9   attendant, and factory helper.  (AT 9-23.)  The ALJ's decision became the final decision of the

10  Commissioner when the Appeals Council denied plaintiff's request for review.  (AT 1-3.)

11  Plaintiff subsequently filed this action.

12         B.     Summary of the ALJ's Findings

13         The ALJ conducted the required five-step evaluation and concluded that plaintiff

14  was not disabled within the meaning of the Act.  At step one, the ALJ concluded that plaintiff

15  had not engaged in substantial gainful activity since August 30, 2007, the alleged disability onset

16  date.  (AT 11.)  At step two, the ALJ concluded that plaintiff had the following "severe"

17  impairments:  "insulin dependent diabetes mellitus, hypertension, obesity, depression, probable

18  ────────────────

19         of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
        404, Subpt. P, App.1?  If so, the claimant is automatically determined
        disabled.  If not, proceed to step four.

20

21         Step four:  Is the claimant capable of performing his past
        work?  If so, the claimant is not disabled.  If not, proceed to step five.

22         Step five:  Does the claimant have the residual functional
        capacity to perform any other work?   If so, the claimant is not
23      disabled.  If not, the claimant is disabled.

24  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

25         The claimant bears the burden of proof in the first four steps of the sequential evaluation
        process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
26  evaluation process proceeds to step five.  Id.

borderline intellectual functioning, and alcohol dependence." (Id.)

At step three, the ALJ determined that plaintiff's impairments, whether alone or in combination, did not meet or medically equal any impairment listed in the applicable regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1. (AT 13.) In particular, the ALJ found that plaintiff's impairments did not meet Listing 12.05C because "the record does not support a conclusion that the claimant has mild mental retardation, and there is no evidence of adaptive deficits or intellectual deficits manifested prior to age 22. Thus, the requirements of that listing are not met or equaled." (AT 14.)

The ALJ further determined that plaintiff has the RFC to perform "medium work," "except that he can only occasionally bend, crouch, and kneel. He is unable to climb ladders, ropes, or scaffolds; and should not work around dangerous machinery or at heights. He can understand, remember, and carry out one or two-step simple job instructions, interact appropriately with supervisors, co-workers and the public and he can maintain concentration, persistence and pace for simple job tasks." (AT 15.) In making this RFC determination, the ALJ found that plaintiff's statements regarding his symptoms were "not credible to the extent they are inconsistent with the above" RFC. (AT 20.) The ALJ gave "great weight" to the opinion of non-examining physician, Dr. W. Miller Logan M.D., who opined that plaintiff could perform "simple" tasks in a routine work setting.[4] (AT 20.) The ALJ found Dr. Logan's opinion to be consistent with evidence of claimant's limited treatment, successful use of psychotropic medication, and the record as a whole. (Id.)

At step four, the ALJ considered the VE's testimony and concluded that plaintiff was unable to perform his past work but could perform other work. (AT 21.) Based on plaintiff's ability to perform jobs that exist in significant numbers in the national economy, the ALJ found that plaintiff is "not disabled." (AT 21-22.)

---

[4] Like examining psychologist Dr. Sylvia A. Hamilton, non-examining physician Dr. Logan diagnosed plaintiff with Borderline Intellectual Functioning. (AT 312 (finding "BIF").)

II.    STANDARDS OF REVIEW

       The court reviews the Commissioner's decision to determine whether it is: (1) free of legal error, and (2) supported by substantial evidence in the record as a whole.  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009); accord Vernoff v. Astrue, 568 F.3d 1102, 1105 (9th Cir. 2009).  This standard of review has been described as "highly deferential."  Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).  "'Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); accord Valentine, 574 F.3d at 690.  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Andrews, 53 F.3d at 1039; see also Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").  Findings of fact that are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g); see also McCarthy v. Apfel, 221 F.3d 1119, 1125 (9th Cir. 2000).  "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's."  Bray, 554 F.3d at 1222; see also Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld.") (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

       However, the court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'"  Ryan, 528 F.3d at 1198 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)); accord Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "To determine whether substantial evidence supports the ALJ's decision, [a court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion."  Andrews,

5

1   53 F.3d at 1039.

2        "If additional proceedings can remedy defects in the original administrative

3   proceeding, a social security case should be remanded."  Marcia v. Sullivan, 900 F.2d 172, 176

4   (9th Cir. 1990) (quoting Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981)).  "Where the

5   Secretary is in a better position than this court to evaluate the evidence, remand is appropriate."

6   Id. (citing McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989)).  However, when

7   appropriate, the court may also in its discretion order an immediate payment of benefits.  Harman

8   v. Apfel, 211 F.3d 1172, 1177–78 (9th Cir. 2000).

9   III.   DISCUSSION

10           A.        The ALJ Erred In Determining That Plaintiff's Impairments Do Not Meet
                       Or Equal Listing 12.05C
11

12        Plaintiff's first argument is that the ALJ erred in finding that plaintiff's

13   impairments do not meet or equal the requirements of Listing 12.05C ("the Listing").  (Mot. for

14   Summ. J. at 11-13; Reply at 2-3.)  Plaintiff argues that: (1) given his scores on IQ tests

15   administered by examining psychologist Dr. Sylvia A. Hamilton, (2) given Dr. Hamilton's

16   determination that the scores were a "valid measure" of plaintiff's cognitive functioning, and (3)

17   given the ALJ's finding that plaintiff has various "severe" impairments, such as obesity,

18   plaintiff's impairments meet or equal the requirements of the Listing.  (Mot. for Summ. J. at 11-

19   13; Reply at 2-3.)  Plaintiff argues that the ALJ erred in discounting Dr. Hamilton's opinion that

20   the IQ scores were "valid."  (Mot. for Summ. J. at 11-13; Reply at 2-3.)  Plaintiff also argues that

21   the valid IQ scores triggered a rebuttable presumption of a "fairly consistent IQ throughout life,"

22   such that the ALJ erred in finding the Listing was unmet given the record's lack of evidence of

23   "manifestations prior to age 22."  (Mot. for Summ. J. at 11-13; Reply at 2-3.)

24        In response, defendant argues that even though plaintiff's IQ scores were within

25   the range stated within the Listing, the ALJ "properly questioned" both the validity of those

26   scores and Dr. Hamilton's opinion that the scores were valid.  Defendant also argues that the ALJ

6

1  "reasonably questioned how much effort Plaintiff put forth" on his IQ tests and properly

2  considered the scores to be somewhat contradicted given plaintiff's prior work as a truck driver

3  and his having obtained a GED.  (Opp'n at 9-10.)  Defendant also argues that the ALJ properly

4  found that plaintiff "failed to provide evidence demonstrating an onset date prior to age 22 as

5  required by the [L]isting."  (Id.)

6          For the reasons described below, the undersigned finds that plaintiff's arguments

7  are well-taken.

8          1.    Listing 12.05C

9          At Step Three, the ALJ asks whether the claimant's impairment or combination of

10  impairments meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1 ("the

11  Listings"), and if the answer is yes, the claimant is automatically determined disabled.  Lester, 81

12  F.3d at 828 n.5.

13          Listing 12.05C, mental retardation, "refers to significantly subaverage general

14  intellectual functioning with deficits in adaptive functioning initially manifested during the

15  developmental period; i.e., the evidence demonstrates or supports onset of the impairment before

16  age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  The Listing can be met by satisfying the

17  requirements of paragraph C: "A valid verbal, performance, or full scale IQ of 60 through 70 and

18  a physical or other mental impairment imposing an additional and significant work-related

19  limitation of function."[5]  Id.  The Listing continues: "For paragraph C, we will assess the degree

20

21          [5]  The text of Listing 12.05C provides:

22          12.05 Mental retardation: Mental retardation refers to
            significantly subaverage general intellectual functioning
23          with deficits in adaptive functioning initially manifested
            during the developmental period; i.e., the evidence
24          demonstrates or supports onset of the impairment before
            age 22.

25          [. . .]

26

                                    7

1   of functional limitation the additional impairment(s) imposes to determine if it significantly

2   limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s),

3   as defined in §§ 404.1520(c) and 416.920(c).  If the additional impairment(s) does not cause

4   limitations that are 'severe' as defined in §§ 404.1520(c) and 416.920(c), we will not find that

5   the additional impairment(s) imposes 'an additional and significant work-related limitation of

6   function,' even if you are unable to do your past work because of the unique features of that

7   work."  Id.

8          Thus, a plaintiff meets the Listing's requirements if he: (1) has an IQ score

9   between 60 and 70 and the evidence demonstrates or supports onset of the impairment before age

10  22; and (2) he has a physical or other mental impairment imposing an additional and significant

11  work-related limitation of function (i.e., a "severe" impairment).  As described below, plaintiff's

12  IQ scores were between 60 and 70[6], evidence in the record supports onset before age 22, and

13  plaintiff has other "severe" impairments that impose significant work-related limitations.

14  ////

15  ////

16  ////

17  ////

18  ////

19

20          C. A valid verbal, performance, or full scale IQ of 60
            through 70 and a physical or other mental impairment
21          imposing an additional and significant work-related
            limitation of function[.]

22  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C.

23      [6] While plaintiff's "Performance" score of "79" falls outside this range, the Listings specify
        that when verbal, performance, and full scale scores are provided by an IQ test, the ALJ must
24      consider the lowest of these scores. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) ("In cases
        where more than one IQ is customarily derived from the test administered, e.g., where verbal,
25      performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in
        conjunction with 12.05.")  Plaintiff's remaining lower scores were 66 (Verbal) and 69 (Full Scale)
26      and thus fall within the range stated in the Listing.  (AT 296-300.)

8

1          2.     <u>The ALJ's Assessment Of Listing 12.05C</u>

2          The ALJ explicitly discussed Listing 12.05C in her Step 3 analysis. (AT 13-14.)

3 The ALJ wrote,

> [t]he claimant's representative argued that the claimant's
> impairments met Listing 12.05C. However, as shown above,
> *the record does not support a conclusion that the claimant has*
> *mild mental retardation*, and *there is no evidence of adaptive*
> *deficits or intellectual deficits manifested prior to age 22.* Thus,
> the requirements of that listing are not met or equaled.

8 (<u>Id</u>. at 14 (emphasis added).) In finding a lack of evidence of a diagnosis of "mild mental

9 retardation," the ALJ referenced her analysis "shown above," apparently referencing her analysis

10 at Step Two regarding plaintiff's alleged "severe" impairments, wherein the ALJ reasoned that:

> claimant obtained IQ scores of 66 (Verbal), 77 (Performance),
> and 69 (Full Scale). Dr. Hamilton stated that the scores
> appeared to be valid and she diagnosed borderline intellectual
> functioning. However, the undersigned finds that the evidence
> is insufficient to establish that the claimant has a severe
> cognitive disorder. It is noted that the scores cited are actually
> in the mild mentally retarded range. However, Dr. Hamilton
> noted that the claimant was only moderately cooperative and put
> forth "some" effort, especially on IQ testing. She indicated
> some evidence of malingering, although she noted this in the
> mood disorder diagnosis. In addition, the report showed that the
> claimant drank alcohol daily, which may limit his ability to
> perform to his best ability on psychological testing. In fact, the
> claimant told Dr. Hamilton that he was drinking a six-pack of
> beer per day. But, other evidence of record shows that the
> claimant was actually drinking much higher quantities of beer
> daily. This could have caused Dr. Hamilton to somewhat
> underestimate the effects of his drinking on his test taking
> abilities and related scores.

21 (AT 13.) Also as part of her Step Two analysis, the ALJ noted plaintiff's previous work as a

22 truck driver, the fact that plaintiff had obtained his GED, and the fact that plaintiff had never

23 attended special education classes, concluding that "the record does not contain a sufficient basis

24 for establishing that the claimant has a severe cognitive disorder." (<u>Id</u>.) Although the ALJ

25 determined there was insufficient evidence of a "severe" mental impairment, she nonetheless

26 found that the evidence sufficiently demonstrated plaintiff's "possible borderline intellectual

1  functioning" and concluded that this "possible borderline" status would be considered in her

2  RFC assessment, along with plaintiff's depressive disorder and alcohol dependence.  (Id.)

3       3.    The ALJ Erred In Finding That The Listing Was Unmet Due To A Lack
             Of Evidence Of "Mild Mental Retardation"

4

5       The ALJ found that plaintiff's impairments did not meet or equal the Listing's

6  requirements.  The first reason was that: "the record does not support a conclusion that the

7  claimant has mild mental retardation . . . ."  (AT 14.)  This reasoning was erroneous.

8       Contrary to the ALJ's belief, a diagnosis of mental retardation is not required in

9  order for a claimant to meet the Listing's requirements.  See Christner v. Astrue, 498 F.3d 790,

10  793 (8th Cir. 2007) ("[W]e have specifically held that a formal diagnosis of mental retardation is

11  not required to fall within the confines of section 12.05.  Thus, it is clear that claimants need only

12  meet the listing requirements stated in section 12.05.  The ALJ erred in giving any credence to

13  the lack of a diagnosed mental deficiency in [plaintiff's] case.") (internal citations omitted);

14  Frazier v. Astrue, No. CV–09–3063–CI, 2010 WL 3910331, at *4 (E.D. Wash. Oct. 4, 2010)

15  (unpublished) (holding that "[t]here is no requirement for a formal diagnosis of 'mental

16  retardation'" for a plaintiff to meet Listing 12.05C); Cauffman v. Astrue, No. C10–281–JCC

17  –JPD, 2010 WL 5464815, at *10 (W.D. Wash. Nov. 12, 2010) (unpublished) (holding that a

18  "lack of a diagnosis of mental retardation . . . has no bearing on whether plaintiff's impairments

19  meet listing 12.05(C)."); Lewis v. Astrue, No. C 06-6608 SI, 2008 WL 191415, at *5–7 (N.D.

20  Cal. Jan. 22, 2008) (unpublished) (finding that "the ALJ erred by holding that claimant had to

21  make a showing of mental retardation beyond that which is required by Listing 12.05" by also

22  requiring evidence of a diagnosis of mental retardation).

23       As described above, the Listing is satisfied if a claimant has: (1) a valid IQ score

24  between 60 and 70, with the evidence supporting onset of the impairment before age 22; and (2)

25  a physical or other mental impairment imposing an additional and significant work-related

26  limitation of function.  Satisfying the Listing does not require evidence supporting a diagnosis or

"conclusion" that the claimant has "mild mental retardation," contrary to the ALJ's apparent belief.  (AT 14.)  Accordingly, the ALJ erred in relying in part upon a lack of diagnosis of mild mental retardation in finding that the Listing was not met or equaled.

4.   The ALJ Erred In Finding That The Listing Was Unmet Due To A Lack Of Evidence Of Manifestation Prior To Age 22

In finding that plaintiff's impairments did not meet or equal the Listing's requirements, the second of the ALJ's two proffered reasons was that: "there is no evidence of adaptive deficits or intellectual deficits manifested prior to age 22." (AT 14.)  This reasoning was also erroneous.

In response to defendant's argument that plaintiff failed to met his burden of producing evidence of manifestation of mental impairments prior to age 22 (Opp'n at 10), plaintiff argues that his valid adult IQ score itself triggers a rebuttable presumption that the impairment existed before the age of 22.  (Reply at 2-3 (citing out-of-circuit cases).)  Plaintiff's argument is well-taken.

The Ninth Circuit Court of Appeals has not addressed the rebuttable presumption that plaintiff urges, but several other circuits have addressed the issue.  See Hodges v. Barnhart, 276 F.3d 1265, 1268–69 (11th Cir. 2001) (IQ scores after age 22 satisfy the listing criteria and "create a rebuttable presumption of a fairly constant IQ throughout life") (citing Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001), Luckey v. U.S. Dept. Of Health and Human Services, 890 F.2d 666, 668 (4th Cir. 1989)).  Further, district courts within the Ninth Circuit have applied the rebuttable presumption regarding onset of mental limitations prior to age 22.  Compare, e.g., Flores v. Astrue, No. CV 11–10714–MAN, 2013 WL 146190, at *4-5 (C.D. Cal. Jan. 11, 2013) (unpublished) (collecting cases and adopting rebuttable presumption); Woods v. Astrue, No. CIV S–10–2031 GEB EFB P, 2012 WL 761720, at *3-4 (E.D. Cal. March 7, 2012) (unpublished) (adopting rebuttable presumption and finding that "[a]bsent some evidence of a change in cognitive ability or some other persuasive information to account for a change in condition

11

1    relating to the plaintiff's ability prior to age 22 and the date of the IQ testing, there appears to be

2    no factual basis for concluding that the IQ inexplicably dropped after age 22."); Forsythe v.

3    Astrue, No. 1:10–cv–01515 AWI GSA, 2012 WL 217751, at *7-9 (E.D. Cal. Jan. 24, 2012)

4    (unpublished) (collecting cases and adopting presumption); Schuler v. Astrue, No. CV

5    09–2126–PLA, 2010 WL 1443892, at *6 (C.D. Cal. Apr. 7, 2010) (unpublished) ("a valid

6    qualifying IQ score obtained by the claimant after the age of 22 creates a rebuttable presumption

7    that the claimant's mental retardation began prior to the age of 22, as it is presumed that IQ

8    scores remain relatively constant during a person's lifetime."); Jackson v. Astrue, No. CV

9    08–1623 JC, 2008 WL 5210668, at *6-7 (C.D. Cal. Dec. 11, 2008) (unpublished) ("several

10   circuits have held that valid IQ tests create a rebuttable presumption of a fairly constant IQ

11   throughout a claimant's life . . . The Court finds the reasoning of the Seventh, Eighth, and

12   Eleventh Circuits to be persuasive."); with Clark v. Astrue, No. CIV S–10–2863 GGH, 2012 WL

13   423635, at *5-6 (E.D. Cal. Feb. 8, 2012) (unpublished) (declining to adopt rebuttable

14   presumption, "especially in a situation where there are glaring discrepancies in the IQ scores in

15   the first place"); Rhein v. Astrue, No. 1:09–cv–01754–JLT, 2010 WL 4877796, at *8 (E.D. Cal.

16   Nov. 23, 2010) (unpublished) (declining to adopt rebuttable presumption on grounds it would

17   remove plaintiff's burden at Step Three).

18           The undersigned finds those cases applying the rebuttable presumption

19   persuasive, and, to the extent plaintiff's IQ scores were "valid," will apply the presumption here.

20   As described below, the ALJ erred in discounting Dr. Hamilton's opinion that the scores were

21   valid, and the ALJ's decision to reject the IQ scores was not based in substantial evidence.

22                   a.      The ALJ Erred In Discounting Dr. Hamilton's Opinion That Plaintiff's IQ

23                           Scores Were "Valid"

24           After examining plaintiff on April 22, 2009, Dr. Hamilton opined that plaintiff's

25   IQ test results of 66 (Verbal), 77 (Performance), and 69 (Full Scale) were a "valid measure of the

26   claimant's current cognitive functioning."  (AT 295-300.)  She noted that "[d]uring testing, the

1   claimant was polite, moderately cooperative, and put [forth] some effort," that plaintiff's IQ

2   scores were "consistent with Borderline Intellectual Functioning difficulties," and that plaintiff

3   "does not appear able to manage his own funds." (AT 295-300.)  Dr. Hamilton also noted that

4   plaintiff reported that he was "using alcohol daily," although her report does not indicate the

5   quantity of alcohol she believed plaintiff used. (AT 296.)

6          Dr. Hamilton opined that plaintiff's IQ scores were "valid," but the ALJ

7   discounted that opinion for several reasons: (1) because Dr. Hamilton "may" have "somewhat

8   underestimate[d]" the effects of plaintiff's alcohol use upon his IQ scores given that plaintiff

9   "told Dr. Hamilton that he was drinking a six-pack of beer per day" but was actually drinking

10  "much higher quantities;" (2) in light of Dr. Logan's non-examining physician's opinion; (3)

11  given Dr. Hamilton's notes that plaintiff was "moderately" cooperative and put forth "some"

12  effort on the IQ tests; (4) given that plaintiff may have been malingering (albeit as to his mood

13  disorder and not as to his IQ tests); and (5) because plaintiff's work history, receipt of his GED,

14  and lack of special education classes tend to undermine his IQ scores. (AT 13-14, 20-21.)  For

15  various reasons described below, the ALJ erred in rejecting Dr. Hamilton's opinion that

16  plaintiff's IQ scores were valid. (AT 13, 297.)

17         The Ninth Circuit Court of Appeals has not delineated what evidence an ALJ

18  should consider in assessing whether IQ scores are "valid."[7]  However, district courts within the

19  Ninth Circuit have addressed what evidence an ALJ may consider in assessing the validity of IQ

20  scores. E.g., Wedge v. Astrue, 624 F. Supp. 2d 1127, 1131-35 (C.D. Cal. 2008) (summarizing

21  considerations from out-of-circuit cases, such as whether the evidence shows a high possibility of

22

23          [7]  In an unpublished opinion, the Court of Appeals noted that while it has no doubt that an
     ALJ could find IQ scores invalid, it has never delineated what factors an ALJ should consider in
24   making such a determination.  Thresher v. Astrue, 283 Fed. App'x 473, 475 (9th Cir. 2008).
     Although Thresher is an unpublished decision and thus only of persuasive value, it is cited herein
25   pursuant to Ninth Circuit Rule 36-3, which provides that "Unpublished dispositions and orders of
     this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance
26   with FRAP 32.1."

1   malingering, daily activities inconsistent with the IQ scores, inconsistencies between test results,

2   and conflicting medical opinions); <u>Vasquez v. Astrue</u>, No. EDCV 11–883–OP, 2012 WL

3   590019, at *6-7 (C.D. Cal. Feb. 21, 2012) (unpublished) (same).

4            For instance, in <u>Wedge</u>, the district court reversed and remanded for an award of

5   benefits because the ALJ erred in finding that the plaintiff's IQ scores were invalid.  <u>Wedge</u>, 624

6   F. Supp. 2d at 1133-34.  The ALJ in <u>Wedge</u> relied on: (1) the conclusory report of a non-

7   examining psychologist that did not directly conflict with the examining psychologist's opinion

8   that the IQ scores were valid, (2) a test result (the "MMPI") that indicated plaintiff was

9   malingering, albeit not specifically as to his IQ or mental capacity, and (3) a belief that plaintiff's

10  activities were inconsistent with the level of impairment suggested by the IQ scores.  <u>Id.</u> at 1132-

11  33.  The district court found that the ALJ erred by relying on the non-examining psychologist's

12  "conclusory and unsubstantiated" opinion to invalidate the IQ scores.  While the *examining*

13  psychologist opined that the scores were valid, the non-examining psychologist "did not explain

14  why his conclusion based on the test results differed from the examining psychologist's

15  conclusion," and the non-examining psychologist's opinion conflicted with evidence in the

16  record.  <u>Id.</u> at 1133-34.  The court also found that "at no time did the non-examining psychologist

17  proffer an opinion that contradicted the examining psychologist's assessment of the plaintiff's IQ

18  and mental capacity."  <u>Id.</u>  Further, while MMPI test results indicated that plaintiff was a

19  malingerer, there was "little evidence" elsewhere in the record to support that finding, given that

20  plaintiff passed another test used to screen out "gross malingerers" and given that there was no

21  "strong evidence anywhere else in the record that plaintiff was malingering."  <u>Id.</u>  Finally,

22  regarding the ALJ's belief that plaintiff's daily activities contradicted his IQ scores, the district

23  court found that the activities were actually "consistent with low to borderline intellectual

24  functioning," noting that the evidence of record confirmed plaintiff "received average to poor

25  grades, and did not graduate from high school."  <u>Id.</u>

26  ////

1    As described below, the ALJ's erroneous reasoning in <u>Wedge</u> is fairly analogous

2    to the ALJ's reasoning in this case: both ALJs improperly rejected the examining psychologist's

3    opinion that the IQ scores were valid by relying on a conclusory opinion from a non-examiner

4    who did not directly opine about the plaintiff's IQ or mental capacity; both ALJs improperly

5    construed a "malingering" score on a non-IQ test as undermining the validity of the IQ scores;

6    and both ALJs improperly deemed the plaintiffs' histories of poor grades and similar evidence as

7    undermining the IQ scores when such evidence is not clearly inconsistent with borderline

8    intellectual functioning, or the IQ scores in question.  See <u>Wedge</u>, 624 F. Supp. 2d at 1133-34.

9         i.    *The Record Does Not Support The ALJ's Premise That Dr. Hamilton*

10            *Believed Plaintiff Drank "A Six-Pack" Of Beer Per Day*

11       The ALJ discounted Dr. Hamilton's opinion that plaintiff's IQ scores were valid

12   primarily because the ALJ believed that Dr. Hamilton may have "somewhat underestimate[d]"

13   the effects of plaintiff's drinking upon his scores, given that plaintiff "told Dr. Hamilton that he

14   was drinking a six-pack of beer per day" but was actually drinking "much higher quantities."

15   (AT 13-14, 20-21.)  The ALJ did not cite to any evidence in the record to support her belief that

16   plaintiff "told Dr. Hamilton that he was drinking a six-pack of beer per day." (AT 13.)  A review

17   of Dr. Hamilton's report, however, does not indicate that plaintiff ever told Dr. Hamilton that he

18   was drinking a six-pack of beer per day.  Instead, the report confirms only that plaintiff informed

19   Dr. Hamilton that he "us[ed] alcohol daily." (AT 296.)  Thus, the evidence of record does not

20   indicate that Dr. Hamilton premised her opinion about the validity of the IQ scores upon

21   plaintiff's consuming a *six-pack* of beer per day. (AT 295-300.)  There is nothing in Dr.

22   Hamilton's report to suggest that Dr. Hamilton was under the impression that plaintiff drank a

23   "six-pack" of beer daily and not more.[8]  Accordingly, contrary to the ALJ's suggestion, the fact

24

25       [8]  While Dr. Hamilton's report indicates that she reviewed any "available accompanying
     documents" in connection with her examination, the report later clarifies that "[t]here were no
26   accompanying documents to be reviewed at the time of this evaluation." (AT 295.)  Even if Dr.

1  that plaintiff may have consumed "much higher quantities" than a six-pack per day does not

2  undermine Dr. Hamilton's medical opinion that the IQ scores were valid.[9]

3         The evidence of record confirms that Dr. Hamilton considered plaintiff's daily

4  alcohol consumption and its impact upon his IQ scores before opining that the IQ scores were

5  valid.  (AT 296-300.)  The ALJ's belief that Dr. Hamilton "somewhat underestimate[d]" the

6  *amount* of alcohol plaintiff consumed on a daily basis does not find support in the record.

7  Accordingly, the ALJ erred in discounting Dr. Hamilton's opinion that the IQ scores were valid

8  on the basis of her "underestimating" plaintiff's daily alcohol consumption.  The evidence of

9  record simply does not support the ALJ's finding that Dr. Hamilton "could have . . . somewhat

10  underestimate[d]" the amount plaintiff consumed daily.  (AT 13.)

11         ii.    *Dr. Hamilton's Examining Opinion Is Generally Entitled To More Weight*

12                *Than Dr. Logan's Non-Examining Opinion*

13         Aside from the ALJ's erroneous premise that Dr. Hamilton mistakenly believed

14  plaintiff drank a "six-pack" of beer daily, the ALJ gave other reasons for discounting Dr.

15  Hamilton's opinion, including her belief that Dr. Logan's opinion was entitled to more weight.

16  (AT 19-20.)

17         To evaluate whether an ALJ properly rejected a medical opinion, in addition to

18  considering its source, the court considers: (1) whether contradictory opinions are in the record;

19  and (2) whether clinical findings support the opinions.  An ALJ may reject an examining medical

20  professional's uncontradicted opinion only for "clear and convincing" reasons.  Lester, 81 F.3d at

21  _____

22  Hamilton reviewed plaintiff's entire medical history in connection with her report, however, Dr.
   Hamilton would have seen references to plaintiff reporting varying amounts of daily alcohol
   consumption, such that her opinion of the IQ scores' validity would not clearly be premised upon

23  a belief that plaintiff drank a six-pack versus some other amount daily.  (E.g., AT 254, 288.)

24         [9] An ALJ's "factual errors" may undermine his conclusions and may ultimately render them
   unsupported by substantial evidence in the record.  See, e.g., Newman v. Astrue, No. 08cv2066 BTM

25  (CAB), 2010 WL 2523948, at *5-6 (S.D. Cal. June 18, 2010) (unpublished) (granting summary
   judgment for plaintiff in part due to the ALJ's factual errors and finding that the errors undermined

26  the ALJ's determinations).

830-31.  In contrast, an examining medical professional's contradicted opinion may be rejected

for "specific and legitimate" reasons supported by substantial evidence in the record.  Id. at 830.

A nonexamining physician's opinion cannot by itself constitute substantial evidence justifying

the rejection of the opinion of either an examining physician or a treating physician.  Id. at 831.

A specialist's opinion is generally given more weight about medical issues related to his or her

area of specialty than to the opinion of a non-specialist.  20 C.F.R. § 404.1527(c)(5).  Further,

when rejecting IQ scores that an examining psychologist deemed "valid," an ALJ cannot rely on

a non-examining psychologist's "conclusory and unsubstantiated" opinion that does not "explain

why [its] conclusion based on the test results differed from the examining psychologist's

conclusion" and where the non-examining psychologist's opinion conflicts with evidence in the

record and does not expressly contradict the examiner's assessment of the IQ scores or mental

capacity.  Wedge, 624 F. Supp. 2d at 1133-34; see also Markle v. Barnhart, 324 F.3d 182, 187

(3rd Cir. 2003) (finding error in the ALJ's rejection of plaintiff's IQ scores and holding that the

"ALJ's reliance on the opinion of the State medical agency consultant was misplaced" in part

because "[t]here was no expert opinion of a psychologist or medical person to contradict" the

examining physician's opinion regarding plaintiff's IQ.)

   Here, Dr. Hamilton was a consultative examining psychologist who administered

IQ tests to plaintiff, who observed his demeanor during the testing, and who opined that

plaintiff's resulting IQ scores were a "valid" measure of plaintiff's cognitive functioning.  (AT

295-300.)  There is no contradictory medical opinion evidence in the record assessing plaintiff's

mental abilities — and no conflicting IQ test scores — so the ALJ had to give "clear and

convincing" reasons for discounting Dr. Hamilton's opinion that plaintiff's IQ scores were valid.

See Lester, 81 F.3d at 830-31.  The record contains a check-the-box report completed by non-

examining physician Dr. Logan (AT 306-19), who opined that plaintiff was limited to "simple,

repetitive" tasks.  (AT 308.)  This non-examining physician's opinion does not contradict Dr.

////

1    Hamilton's opinion that plaintiff's IQ scores were valid.[10]  See, e.g., Wedge, 624 F. Supp. 2d at

2    1133-34.  Indeed, the examiner's medical opinion in this case is arguably less contradicted than

3    the examiner's opinion in Wedge: where the non-examiner in Wedge expressly disagreed with

4    the examiner regarding the validity of the claimant's IQ scores but did so only in a "conclusory"

5    fashion, here the non-examiner did not squarely address the validity of plaintiff's IQ scores, in a

6    conclusory fashion or otherwise.  See id.

7            Further, even if Dr. Logan's form did somehow contradict Dr. Hamilton's

8    examination report with respect to plaintiff's IQ, the fact remains that Dr. Hamilton is a

9    _psychologist_ with specialization in assessing cognitive abilities that presumably surpasses the

10   relative expertise of a _non-psychologist M.D._ like Dr. Logan on such issues.  See 20 C.F.R. §

11   404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical

12   issues related to his or her area of specialty than to the opinion of a source who is not a

13   specialist.").  Given Dr. Hamilton's specialization as a psychologist, her opinion was entitled to

14   more weight than the opinion of the non-examining non-psychologist physician, at least with

15   respect to assessment of plaintiff's cognitive abilities and IQ scores.  Yet, the ALJ never

16   recognized these physician's differing specializations when rejecting Dr. Hamilton's opinion

17   regarding plaintiff's IQ scores.  (AT 13-14, 19-20.)  Accordingly, the ALJ erred in deeming Dr.

18   Logan's opinion entitled to more weight than Dr. Hamilton's.

19           iii.    _Dr. Hamilton Considered Plaintiff's Levels Of Cooperation And Effort_

20                   _And Still Opined That The IQ Scores Were "Valid"_

21           The ALJ also believed that Dr. Hamilton's opinion was entitled to less weight

22   given plaintiff's putting forth only "some" effort and being "moderately" cooperative during the

23

24        [10]  Dr. Logan's opinion and Dr. Hamilton's opinion were also consistent regarding plaintiff's
     mental condition: both diagnosed plaintiff with "BIF," or "Borderline Intellectual Functioning."
25   (Compare AT 312 with AT 297-98.)  In any event, in analyzing the applicability of the Listing, the
     ALJ did not describe _how_ she believed Dr. Logan's opinion materially contradicted Dr. Hamilton's
26   regarding the validity of plaintiff's IQ scores or plaintiff's mental abilities.  (AT 13, 20-21.)

1    examination.  The ALJ focused on Dr. Hamilton's notation that plaintiff was "moderately"

2    cooperative and put forth "some" effort on his tests, which, according to the ALJ, "may" have

3    artificially lowered plaintiff's IQ scores.  (AT 13.)

4         Reading the report in context, however, reveals that Dr. Hamilton opined that

5    plaintiff's IQ scores were "valid" *despite* plaintiff's having been "moderately cooperative" and

6    putting forth "some" effort on the tests.  (AT 297.)  Dr. Hamilton's report provides, in pertinent

7    part, that "[d]uring testing, the claimant was polite, moderately cooperative, and put [forth] some

8    effort.  The following test results appear to be a valid measure of the claimant's current cognitive

9    functioning."  (Id.)  The record thus reveals that Dr. Hamilton opined that the scores were "valid"

10   *after specifically considering* the level of cooperation and effort that plaintiff put forth.  (AT

11   297.)

12        Moreover, Dr. Hamilton's report is the only medical opinion evidence in the

13   record addressing plaintiff's cognitive ability and the validity of plaintiff's IQ scores.  Therefore,

14   the only non-conclusory medical opinion evidence in the record assessing plaintiff's cognitive

15   abilities and IQ indicates that the scores were indeed "valid."  See Wedge, 624 F. Supp. 2d at

16   1133-34 (ALJ erred in discounting IQ scores by relying in part upon the non-examining

17   psychologist's conclusory opinion, where the only non-conclusory medical opinion in the record

18   addressing claimant's "IQ and mental capacity" was the examining psychologist's opinion that

19   the IQ scores were "valid").  On these particular facts, it was error to discount Dr. Hamilton's

20   opinion based upon her use of the adjectives "moderately" and "some."  This scintilla of

21   "evidence" of plaintiff's possible efforts to deflate his IQ scores does not rise to the level of

22   substantial evidence sufficient to reject the examining psychologist's opinion.[11]

23   ////

---

24        [11]   The ALJ was not present during Dr. Hamilton's examination of plaintiff.  It was Dr.

25   Hamilton, not the ALJ, who personally observed plaintiff's levels of effort and cooperation during
     the IQ testing.  It follows that Dr. Hamilton, not the ALJ, is in the best position to assess the impact

26   of such effort and cooperation upon the validity of the IQ test results.

1          While the text of the Listing permits an ALJ to discount invalid IQ scores, the

2   ALJ may not substitute her own medical opinion for Dr. Hamilton's.  See, e.g., Tackett v. Apfel,

3   180 F.3d 1094, 1102–03 (9th Cir. 1999) (finding the ALJ erred in substituting his own opinion

4   for that of a treating physician, as "there [was] no medical evidence to support the ALJ's finding"

5   that plaintiff needed breaks every two hours where all medical providers opined he needed breaks

6   every half hour).  The ALJ is not a medical professional with the medical expertise necessary to

7   deem a particular IQ test result invalid herself, without citation to competing medical evidence of

8   record, let alone by relying on the administering psychologist's use of particular adjectives that

9   the psychologist herself did not deem to alter the scores' validity.

10              iv.     *The Minimal Evidence Of Malingering Does Not Undercut Dr. Hamilton's*

11                      *Opinion Regarding The Validity Of Plaintiff's IQ Scores*

12          The ALJ also appeared to discount Dr. Hamilton's opinion in part because there

13   was "some evidence of malingering" by plaintiff.  (AT 13, 298 (listing "Dysthymic Disorder,

14   Malingering" at "Axis I" of "Diagnostic Impressions")).)  However, as the ALJ herself noted, Dr.

15   Hamilton assessed plaintiff as "malingering" *with respect to his "mood disorder.*"  (AT 13 ("She

16   indicated some evidence of malingering, although she noted this in the mood disorder

17   diagnosis.").)  There is no medical opinion evidence in the record indicating plaintiff was

18   malingering *as to his mental abilities or IQ scores*.  Moreover, Dr. Hamilton specifically opined

19   that plaintiff's IQ scores were "valid" measures of his cognitive abilities *despite* referencing

20   "malingering" in connection with plaintiff's mood disorder.  (AT 298.)  Again, the only medical

21   opinion evidence in the record regarding plaintiff's cognitive abilities and IQ scores indicates

22   that the scores were valid.  There is no strong evidence in the record indicating that plaintiff was

23   malingering.  See Wedge, 624 F. Supp. 2d at 1133-34 (holding that an MMPI test result

24   suggesting the claimant was malingering "does not explain why the IQ scores should be

25   ////

26   ////

20

completely invalidated.")[12]   Taking Dr. Hamilton's report in its entirety, the ALJ's focus on Dr.

Hamilton's reference to "malingering" in her *mood disorder* diagnosis does not rise to the level

of substantial evidence supporting the rejection of Dr. Hamilton's opinion that the IQ scores were

valid.

        v.     *The Fact That Plaintiff Worked As A Truck Driver And Obtained His GED*

        *Does Not Necessarily Undercut Dr. Hamilton's Opinion That Plaintiff's*

        *IQ Scores Were Valid*

        The ALJ also rejected Dr. Hamilton's opinion that the IQ scores were valid given

that plaintiff "worked as a truck driver," which required him to apply "knowledge of commercial

driving regulations as well as skill," to "make good judgments when driving," and to complete

written reports.  (AT 13.)  The ALJ rejected Dr. Hamilton's opinion in part because plaintiff

"obtained a GED and did not attend special education classes . . . ."  (Id.)  However, while

plaintiff worked as a truck driver and obtained his GED, taking the record as a whole, substantial

evidence does not support the ALJ's rejection of Dr. Hamilton's opinion that the scores were

valid.  See Wedge, 624 F. Supp. 2d at 1133-34 (citing cases and holding that the ALJ erred in

rejecting the plaintiff's IQ scores in light of her daily activities, education, and work history,[13] as

these did "not constitute substantial discrepancies that would invalidate her IQ scores.")

        Here, the evidence of record supports onset of plaintiff's deficits in adaptive

functioning prior to age 22.  Plaintiff dropped out of high school in tenth grade because he was

"failing all [his] classes," even though he had been trying to do well (AT 40); plaintiff struggled

---

[12]   The district court in Wedge held that the ALJ erred in discrediting plaintiff's IQ scores based on her MMPI score (indicating "malingering") because an MMPI score should considered with the other evidence of record — plaintiff's daily activities, education, and work history.  Wedge, 624 F. Supp. 2d at 1134.  The court held that the ALJ erred in deeming plaintiff's activities "inconsistent with the degree of mental impairment claimed" and discounting the IQ scores as a result.  Id.

[13]   The district court in Wedge found that the plaintiff had activities "consistent with her low to borderline intellectual functioning," given that she "never had substantial gainful employment, has not been able to graduate high school, has attended special education classes, and has done poor to average in the classes she attended."  Wedge, 624 F. Supp. 2d at 1134.

1   academically even "before high school," receiving mostly Cs and Ds in grammar school and

2   mostly Ds in junior high (AT 16, 40); and plaintiff took remedial classes and attended a

3   continuation school where "if you show up you can pretty much pass the class," but did not

4   graduate from that program and dropped out to join the military (AT 41).

5          The fact that plaintiff ultimately received his GED does not eviscerate a long

6   record of academic difficulty or IQ scores between 60 and 70.  Indeed, courts have noted that a

7   plaintiff's having a semi-skilled work history or obtaining a GED are not necessarily inconsistent

8   with having relatively low IQ scores.  See, e.g., Wedge, 624 F. Supp. 2d at 1133-34 (plaintiff's

9   lack of gainful employment, dropping out of high school, attending some special education

10  classes, and doing "poor to average" in her classes did "not constitute substantial discrepancies

11  that would invalidate her IQ scores" and were actually "consistent with her low intellectual

12  functioning"; Gomez v. Astrue, 695 F. Supp. 2d 1049, 1059-61 (C.D. Cal. 2010) (remanding for

13  an award of benefits in part because, although plaintiff had worked for about seven years,

14  "[p]laintiff's uncontroverted testimony was that he either obtained those jobs with the assistance

15  of relatives or actually worked for relatives.  Thus, the record as a whole does not support

16  defendant's contention that plaintiff's work history is materially inconsistent with" his IQ scores,

17  and also because "[p]laintiff's testimony about his educational history and his school records do

18  not provide substantial evidence for ignoring or rejecting his verbal IQ of 63") (citing Brown v.

19  Sec'y of Health & Human Servs., 948 F.2d 268, 270 (6th Cir. 1991)); Brown, 948 F.2d at 270

20  (holding that in his work as a truck driver, plaintiff "recorded mileage, the hours he worked, and

21  the places he drove," but that this was not inconsistent with an IQ score of 68, and finding "there

22  is not substantial evidence in the record to support the Secretary's rejection of claimant's IQ

23  scores.")[14]; see generally, Markle, 324 F.3d at 183-184, 187 (holding that the evidence of record

24

25          [14]  The court in Brown also noted that "the Secretary could have administered a second I.Q.
    test were he certain of the invalidity of Mr. Brown's scores. He did not."  Brown, 948 F. 2d at 270

26  (reversing and remanding in light of erroneous determination that the IQ scores were invalid).

was not inconsistent with scores meeting the Listing's IQ requirement where the claimant dropped out in tenth grade, obtained a GED, and could read, write, add, and subtract, but had problems with multiplication and division).

As to the ALJ's reliance upon plaintiff's having completed "written reports" as part of his truck driver position (AT 13), the record reveals only that plaintiff wrote "Yes" on a form in response to the question "[Did you do] any writing, complete reports, or perform duties like this?" (AT 136.) The ALJ did not ask plaintiff to expand upon this response during the hearing. Without further details, it is impossible to tell what kind of "reports" plaintiff completed in his capacity as a truck driver; the record does not reveal the frequency of such "reports" and does not reveal whether plaintiff had to check boxes on forms versus writing paragraphs of text. In any event, either sort of writing is not clearly inconsistent with plaintiff's particular IQ scores. See, e.g., Brown, 948 F.2d at 270 (holding that in his work as a truck driver, plaintiff "recorded mileage, the hours he worked, and the places he drove," but that this was not inconsistent with an IQ score of 68, and finding "there is not substantial evidence in the record to support the Secretary's rejection of claimant's IQ scores.") The ALJ did not explain why an ability to do some type of writing conflicts with plaintiff's IQ scores. Similarly, the ALJ did not explain how the ability to drive in accordance with commercial driving regulations reveals cognitive capabilities beyond those reflected in plaintiff's particular IQ scores.

Further, the ALJ also found that the evidence of record supported limiting plaintiff to work involving only "simple" instructions and "simple" job tasks (AT 15, 21), and she also factored plaintiff's "difficulty concentrating or understanding due to possible borderline intellectual functioning" into her RFC assessment (AT 13). If the ALJ herself concluded that the evidence of record supported limiting plaintiff to performing "simple" job instructions and "simple" job tasks (AT 13), this conclusion tends to undercut the ALJ's simultaneous finding that plaintiff's IQ scores were invalid given plaintiff's demonstrated abilities to handle tasks she deemed more complex.

For all the foregoing reasons, the ALJ erred in rejecting Dr. Hamilton's opinion that plaintiff's IQ scores were valid.  Given the ALJ's failure to give sufficient reasons for discounting plaintiff's IQ scores of 66 (Verbal), 77 (Performance), and 69 (Full Scale), the scores are "valid" and the first prong of the Listing is met.[15]

### b.   The Evidence Does Not Indicate That The Presumption Of Manifestation Prior To Age 22 Could Be Rebutted Upon Remand

Applying the rebuttable presumption analysis, the next question is whether the presumption arising from plaintiff's valid IQ scores could be rebutted on remand; that is, whether evidence in the record could show that the onset of plaintiff's impairment was actually *after* age 22.  See, e.g., Woods, 2012 WL 761720 at *3-4.

The language of the Listing supports the use of circumstantial evidence, acquired after the end of a claimant's developmental period, to satisfy the diagnostic requirements of the Listing.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05 ("[T]he evidence demonstrates *or supports* onset of the impairment before age 22.") (emphasis added).[16]  District courts have found that circumstantial evidence can indicate a deficit in adaptive functioning prior to the age of 22.  E.g., Forsythe, 2012 WL 217751, at *7-9 (unpublished) (collecting cases.)  Examples of such circumstantial evidence includes attendance in special education classes, dropping out of school

---

[15]  As noted above, the listings specify that when verbal, performance, and full scale scores are provided by IQ tests, the ALJ must consider the lowest of these scores.  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(D)(6)(c).

[16]  Indeed, in revising the language of Listing 12.05, the Social Security Administration commented:

> The final rules clarify that *we do not necessarily require evidence from the developmental period* to establish that the impairment began before the end of the developmental period. The final rules permit us to use judgment, based on current evidence, to infer when the impairment began. This is not a change in interpretation from the prior rules.

Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746–01 (Aug. 21, 2000) (emphasis added) available at 2000 WL 1173632 at *50753.

prior to graduation, difficulties in reading, writing or math, and low-skilled work history.  See, e.g., Christner, 498 F.3d at 793; Gomez, 695 F. Supp. 2d at 1059-60 (plaintiff dropped out of high school and had academic performance difficulties since elementary school); Campbell v. Astrue, No. 1:09–cv–00465 GSA, 2011 WL 444783, at *17-18 (E.D. Cal. Feb. 8, 2011) (unpublished) (plaintiff earned mostly Ds and Fs, dropped out of high school, and did not earn a GED, all amounting to circumstantial evidence of a deficit in adaptive functioning prior to age 22); Woods, 2012 WL 761720 at *3-4 (holding that plaintiff's ability to obtain his GED *after* age 22 had a "tenuous relevance to plaintiff's intellectual functioning before age 22").

Here, absent some evidence of a change in cognitive ability or some other persuasive information to account for a change in condition relating to the plaintiff's ability prior to age 22 and the date of the valid IQ testing, there appears to be no factual basis for concluding that plaintiff's IQ inexplicably dropped after age 22.  See, e.g., Woods, 2012 WL 761720, at *3-4.  For instance, there is no evidence that plaintiff suffered a head injury or other trauma that would explain a sudden drop in his IQ scores.  E.g., id.; Brooks v. Astrue, No. 3:11–cv–01252–SI, 2012 WL 4739533, at *6 n.3 (D.Or. Oct. 3, 2012) (unpublished) ("Some courts have suggested that the claimant additionally must prove that there were no intervening circumstances between the age of 22 and the date of the IQ test that might account for their limited cognitive functioning.") (citing Rhein, 2010 WL 4877796, at *8).  Here, as described above, the evidence in the record relevant to the time period in question indicates that plaintiff's low IQ indeed manifested before the age of 22.  Plaintiff testified that he had received poor grades since junior high, had to take remedial classes in high school, dropped out after the tenth grade due to poor grades, etc., all despite his efforts to do well.  (AT 13, 16, 40-41.)

Further, the fact plaintiff worked as a truck driver beginning in "1997" (AT 136) — well *after* he turned 22 years old in 1984 — has a "tenuous relevance to plaintiff's intellectual functioning before age 22."  See Woods, 2012 WL 761720 at *3-4.  Accordingly, the record as a whole does not rebut the presumption of onset before age 22.  There is no indication that on

1  remand defendant would be able to rebut the presumption.  To the contrary, most of the available

2  evidence relevant to that question reinforces the presumption that the IQ scores are reflective of

3  plaintiff's intellectual function before the age of 22.

4          c.     Plaintiff's "Severe" Impairments Meet The Second Prong Of The Listing

5          As for the second prong of the Listing, the ALJ herself found that plaintiff had

6  "severe impairments" of "insulin dependent diabetes mellitus, hypertension, obesity, depression,

7  probable borderline intellectual functioning, and alcohol dependence." (AT 11.)  By definition, a

8  "severe" impairment significantly limits an individual's ability to perform basic work activities.

9  (AT 10.)

10          Where the ALJ finds that plaintiff has a "severe" impairment at Step Two, this

11  equates to a finding that the plaintiff meets the second prong of the Listing.  See, e.g., Rowens v.

12  Astrue, No. CIV S–09–0163 GGH, 2010 WL 3036478, at *2-4 (E.D. Cal. Aug. 2, 2010)

13  (unpublished). ("[I]n this circuit, a person who has a severe physical or other mental impairment,

14  as defined at step two of the disability analysis, apart from the decreased intellectual function,

15  meets the second prong of the § 12.05(c) listing."); Rhein, 2010 WL 4877796 at *10 ("a step two

16  finding of a severe impairment necessarily determines that the second prong is satisfied.");

17  Woods, 2012 WL 761720, at *4 (finding that the plaintiff met the Listing's second prong given

18  the ALJ's finding that plaintiff had "severe" impairments at Step 2).

19          Therefore, according to the ALJ's own Step 2 finding that plaintiff has several

20  "severe" impairments (AT 11), plaintiff meets the second criteria for the Listing.

21          B.     Remand For Payment Of Benefits Is Warranted Because Plaintiff's IQ

22                     Scores And Severe Impairments Meet The Listing's Requirements

23          The Ninth Circuit Court of Appeals set forth a three-part test for determining

24  whether to remand a case for further proceedings or for the immediate award of benefits.  The

25  immediate payment of benefits is appropriate where: (1) the ALJ failed to provide legally

26  sufficient reasons for rejecting the evidence; (2) no outstanding issues remain for the ALJ to

1    resolve; and (3) it is clear from the record that the ALJ would be required to find the claimant

2    disabled were such evidence credited.  Moisa v. Barnhart, 367 F.3d 882, 887 (9th Cir. 2004).

3    Where the "record has been thoroughly developed," there is "no reason for remand" for further

4    determinations by the ALJ.  Beneke v. McCarthey, 379 F.3d 587, 593-96 (9th Cir. 2004) (remand

5    unnecessary where the "ALJ improperly discredited much of the evidence" and where it would

6    create a "heads we win; tails, let's play again" system of disability benefits adjudication).  The

7    court may, in its discretion, order an immediate payment of benefits.  In "Social Security Act

8    cases Congress has granted district courts the additional power to reverse or modify an

9    administrative decision without remanding the case for further proceedings." Harman, 211 F.3d

10   at 1177–78.  Under sentence four of 42 U.S.C. § 405(g), "The court shall have the power to

11   enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing the

12   decision of the Secretary, with or without remanding the cause for a rehearing."

13              Here, the ALJ erroneously concluded that plaintiff did not satisfy the requirements

14   of the Listing.  As described above, the ALJ failed to provide legally sufficient reasons for

15   finding that the Listing's requirements were unmet and failed to provide such reasons for

16   rejecting Dr. Hamilton's opinion that plaintiff's IQ scores were valid.  The ALJ also failed to

17   provide reasons based in substantial evidence for rejecting Dr. Hamilton's opinion.  See, e.g.,

18   Wedge, 624 F. Supp. 2d at 1133-34 (remanding for award of benefits where ALJ erred in

19   rejecting IQ scores and thus erred in determining that the Listing's requirements were unmet, and

20   where substantial evidence indicated plaintiff met the Listing given plaintiff's "demonstrated

21   [and] prolonged history of low to borderline intellectual functioning in addition to severe

22   physical functional limitations").

23              When the rejected evidence is credited, the record reveals that plaintiff is disabled

24   and there are no outstanding issues left for the ALJ to resolve.  See Moisa, 367 F.3d at 887.  The

25   substantial evidence of record confirms that plaintiff meets or equals the Listing and there is

26   simply nothing further to be done on remand.  See Brooks, 2012 WL 4739533, at *9.  Thus,

additional proceedings are unnecessary to determine plaintiff's entitlement to benefits and

"would serve no useful purpose." Lester, 81 F.2d at 834.  Although defendant urges that the

matter be remanded for further proceedings, defendant does not specify what further proceedings

should be required.  (Opp'n at 15.)  Accordingly, the undersigned concludes that the proper

remedy in this case is a remand for the calculation of benefits only, and it is unnecessary to

address plaintiff's remaining arguments.

IV.     CONCLUSION

        For the foregoing reasons, IT IS HEREBY ORDERED that:

        1.      Plaintiff's motion for summary judgment (Dkt. No. 11) is granted;

        2.      Defendant's opposition and cross-motion for summary judgment (Dkt. No.

12) is denied; and

        3.      The Clerk is directed to enter a judgment in favor of plaintiff pursuant to

sentence four of 28 U.S.C. § 405(g) and remand for the calculation and award of benefits.

        IT IS SO ORDERED.

DATED:  March 21, 2013

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE